# IN THE COURT OF APPEALS OF IOWA

————————————

No. 26-0457
Filed May 27, 2026

————————————

**In the Interest of P.P, Minor Child,**

**K.P., Mother,**
Appellant.

————————————

Appeal from the Iowa District Court for Linn County,
The Honorable Cynthia S. Finley, Judge.

————————————

**AFFIRMED**

————————————

Ellen Ramsey-Kacena, Assistant Public Defender, Cedar Rapids, attorney
for appellant mother.

Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney
General, attorneys for appellee State.

Julie F. Trachta of Linn County Advocate, Inc., Cedar Rapids, attorney and
guardian ad litem for minor child.

————————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

When her son was one, the mother reached out to the Iowa Department of Health and Human Services for help because she was struggling with her addiction to illegal substances. After more than two years of services, the mother was sadly unable to achieve a sustained period of sobriety. Recognizing the child's need for a "stable, sober and consistent home," the juvenile court found that termination of the mother's parental rights was in the child's best interest. The mother appeals, claiming the court did not give enough weight to her strong bond with the child—both in its best-interest analysis and in its conclusion that no permissive exception applied to preclude termination. We affirm on our de novo review of the record.

## BACKGROUND FACTS

The mother gave birth to her son in April 2022, when she was just nineteen years old. Even at that young age, the mother was already battling an addiction to methamphetamine. She participated in a residential treatment program in 2020 but soon returned to daily use of methamphetamine and other substances, quitting when she learned that she was pregnant with her son.

In November 2023, the mother contacted the department to report that she was using methamphetamine. She placed her son in the maternal grandmother's care and sought treatment at an inpatient facility. The child was adjudicated in need of the court's assistance in December but allowed to remain in the mother's custody while she participated in treatment. The mother completed the program in January 2024 and retained custody of her son under the department's supervision. Unfortunately, the mother relapsed

in March. She returned to residential treatment, and the child was placed back with his grandmother and her husband.

The mother was unsuccessfully discharged from treatment in May, prompting the child's removal from her custody. The child's guardian ad litem reported that while the child was doing well with his grandparents, he was "confused as to why his mother is not with him." All the providers in the case reported that the mother shared a strong bond with the child. The department's case manager observed that during visits the child "does not like to be away from his mom for very long and will often follow her from room to room," sometimes asking, "Mama, why gone?" And the guardian ad litem noted the child "is obviously bonded with his mother and looks to her to meet all of his care needs."

Over the next ten months, the mother made significant progress toward reunification. She completed another round of inpatient treatment before transitioning to an outpatient program in August. The mother obtained housing, provided negative drug screens, engaged in mental-health treatment, and secured employment. Because of this progress, the juvenile court extended the reunification goal twice. During these extensions, the mother transitioned from supervised visitation to a trial home placement in February 2025.

The mother's success did not last long. She tested positive for cocaine in April, which brought an end to the trial home placement. The mother stopped participating in services and was briefly committed to a hospital for her mental health. She also admitted to relapsing on methamphetamine in May. During this upheaval, the child returned to the maternal grandparents' home. His guardian ad litem reported:

> Placement with his grandparents had helped to provide him with stability through his disruptions but [the child] does express confusion regarding why he cannot be with his mother. The more time he spends with [the mother], the harder it is for him to leave her at the end of interactions.

The mother went back to inpatient treatment in June, successfully completing the program the next month. Meanwhile, the State petitioned to terminate the mother's parental rights. But by August, the parties agreed to continue the hearing on the petition because the mother was again making progress. She transitioned to semi-supervised visitation and started unsupervised visits in October. Later that month, the juvenile court granted the mother additional time, finding that she was "making sufficient progress to believe that reunification remains likely." And in December, the mother began having overnight visits with the child.

Once again, the mother's success was short-lived after she started providing more care for the child. She stopped participating in drug testing and avoided meeting with the department's case manager. The termination hearing was reset, and the mother's interactions with the child returned to fully supervised in January 2026. At the end of that month, the mother reported that she was evicted from her apartment and "struggling to stay sober." Because of those struggles, the mother missed some visits with the child because she didn't "want him to see her under the influence." The case manager reported that the child had "big emotions" when that would happen but was otherwise doing well with his grandparents.

The mother did not attend the termination hearing in February, during which the case manager testified that termination of her parental rights was in the child's best interest. The guardian ad litem agreed, telling the juvenile court:

> I think all parties here are very concerned . . . about [the mother]. Everybody wants the best for her, and the person who wants [that] the most is my client, who's very confused right now. But . . . fortunately he is in a very good place. He is with people that he relies on, that he apparently acts out with occasionally, only because they're his safe people.
>
> And I've seen [the mother] with her son. There's no question she loves [him], that what is in your heart tends to show in your actions and your own convictions what you're willing to do, and we're very sad that [the mother] is not in a position to do that and very worried about her own safety, but it is absolutely in my client's best interest to have permanency.

After the hearing, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(h) (2025). The mother appeals.

## ANALYSIS

Our de novo review of termination proceedings follows a familiar three-step framework that considers whether (1) a statutory ground for termination has been established; (2) termination is in the best interest of the child; and (3) a permissive exception applies. *In re L.A.*, 20 N.W.3d 529, 532 (Iowa Ct. App. 2025) (en banc); Iowa Code § 232.116(1)–(3). Because the mother only challenges the second and third steps,[1] we confine our review to those issues. *L.A.*, 20 N.W.3d at 532.

---

[1] The State challenges error preservation on these steps because the mother failed to attend the termination hearing and her attorney did not "ask any questions during the hearing," present evidence, or make a closing argument. *Cf. In re J.R.*, 20 N.W.3d 839, 842 & n.1 (Iowa Ct. App. 2025) (en banc) (noting that in a parent's absence, counsel may preserve error for review and "avoid waiver by advocating the parent's position on the parent's behalf" but declining to decide "whether the mere appearance of a parent's attorney is enough to clear the preservation and waiver hurdles"); *In re M.L.H.*, No. 16-1216, 2016 WL 4803999, at *1 (Iowa Ct. App. Sep. 14, 2016) (finding a father failed to preserve error where his "attorney did not introduce any evidence," "did not make any argument against termination," and told the court the father had "given up"). Assuming without deciding that the challenged steps—which were addressed by the juvenile

In reviewing the best-interest step, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Because a "child's mental and emotional condition and needs is inherently impacted by the child's bond with a parent," that bond "is a relevant consideration in the best-interests analysis." *L.A.*, 20 N.W.3d at 535. But it is not the only consideration, as the mother seems to suggest on appeal.

The juvenile court acknowledged the child's bond with the mother—which was documented in almost every report from the department, its providers, and the guardian ad litem. But the court concluded the child's "need for safety and stability" were paramount:

> He is young and needs a caregiver who is willing to make his needs a priority and provide a stable, sober and consistent home for him. In addition, he has medical needs that require regular medical appointments and accommodations in his care.[2] Neither parent has demonstrated an ability or willingness to do this. [The child] should not be required to wait until such time in the future that his parents are willing to make the changes necessary to be the parents he needs and deserves.

We agree. The defining elements of the best-interest analysis are the child's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011). The mother recognized that she could not provide those

---

court—are properly before us, we elect to resolve them on the merits. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error preservation problem and proceeding to the merits); *accord In re S.P.*, No. 24-2008, 2025 WL 548370, at *2 (Iowa Ct. App. Feb. 19, 2025).

[2] The child was born with an esophageal birth defect, which affects his ability to swallow solid foods and causes him to choke when eating.

basic needs for her son, telling the case manager that she was not "stable enough to provide for [the child] and meet[] her own needs." Her cycles of sobriety and relapse are proof of that. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) ("Insight for the determination of the child's long-range best interests can be gleaned from evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing." (cleaned up)).

"[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). This child has been waiting for much longer than the statutory time frame because of the extensions the mother was given. He should not wait any longer. *See In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (stating where the legislative criteria for termination have been satisfied, "the interests of the child take precedence over family reunification," and the "termination proceedings must be viewed with a sense of urgency" (cleaned up)). So while we do not doubt the mother's love for her son—or their strong bond—we cannot deny this child of permanency any longer.[3] *See P.L.*, 778 N.W.2d at 41.

---

[3] In her best-interest argument, the mother also asserts that a guardianship with the "maternal grandparents would have enabled stability and decision-making without erasing the mother's parental rights." But the mother did not ask the juvenile court to establish a guardianship and, unlike the other steps that we are resolving on the merits, the court did not address the issue in its ruling. *See L.A.*, 20 N.W.3d at 533 (noting an issue must be both "raised" and "decided" to be preserved for appellate review). Even if error had been preserved, a guardianship would not be appropriate—first because "a guardianship is not legally preferred to termination" and second because of the child's young age. *Id.* "There is no persuasive reason to destabilize this young child's future with the uncertainty of a guardianship on the mere hope that the mother will someday be able

The mother next claims that because the child "is in the care of" his maternal grandparents and because of her strong bond with the child, the court should not have terminated her parental rights. *See* Iowa Code § 232.116(3)(a), (c). Where an exception under Iowa Code section 232.116(3) applies, termination may be denied. But these exceptions "are permissive, not mandatory, and the court may use its discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (cleaned up). We conclude the juvenile court correctly found that none of the permissive exceptions to termination should be applied.

Although Iowa Code section 232.116(3)(a) allows the juvenile court not to terminate when a "relative has legal custody of the child," this exception does not apply because the child is not in the custody of his maternal grandparents. *Id.*; *accord A.B.*, 956 N.W.2d at 170.[4] And while section 232.116(3)(c) allows the court to avoid termination when "[t]here is

to safely parent when there is a much more certain option available through termination of rights and adoption." *Id.* at 534.

[4] The mother argues that we should not apply these supreme court decisions because after "the 2022 overhaul of chapter 232," the juvenile court can no longer transfer legal custody of the child to anyone other than the department. *Compare* Iowa Code § 232.102(1)(a) (2021), *with id.* § 232.102(1)(a) (2025). Since section 232.102(1)(a) now requires that "the child's custody shall be transferred to the department" if custody with either of the parents is not in the child's best interest, the mother contends the pre-2022 caselaw on this issue "creates an absurd result; it destroys the exception in § 232.116(3)(a) without a clear statement from the legislature to do so." However, the 2022 amendments did not alter section 232.116(3)(a), which was the provision construed in *A.B.*, 956 N.W.2d at 170, and *A.M.*, 843 N.W.2d at 113. Because we must apply controlling precedent from our supreme court, we reject this argument. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014).

clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship," a bond alone "is not enough." *A.B.*, 956 N.W.2d at 169.

There is no doubt about the love between the mother and her son. But this young child has been out of his mother's custody for two years now. He has found stability with his grandparents, who intend to adopt him and allow contact with the mother, so long as she is "safe and sober." *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (declining to apply bond exception despite "some bond between [the parent] and her children" because the children had been out of the parent's care for nearly two years and had "achieved stability" in a relative's care). So, like the juvenile court, we decline to apply a permissive exception to termination.

**AFFIRMED.**